IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Intrade Co. (UK) Ltd., a private limited company of England and Wales<br>    7-8 Ritz Parade, Western Avenue<br>    London, W5 3RA,<br><br>Mahgoub Sons Trading Co., Ltd., a Sudanese business entity,<br>    3 Zubair Pasha Street<br>    Khartoum, Sudan<br>    P.O. Box 54,<br><br>African Plantation (Sudan) Co., Ltd., a Sudanese business entity,<br>    Khartoum West, Parliament Street<br>    B.4/B-P2/1<br>    Khartoum, Sudan,<br><br>Mahgoub Sons Ginning Co., Ltd., a Sudanese business entity,<br>    Khartoum West, Parliament Street<br>    B.4/B-P2/1<br>    Khartoum, Sudan,<br><br>Almahgoub Pharmaceutical Co., Ltd., a Sudanese business entity,<br>    Khartoum West, Parliament Street<br>    B.4/B-P2/1<br>    Khartoum, Sudan,<br><br>Intrade Commodities DMCC, a United Arab Emirates business entity,<br>    Cluster (T) – Jumeriah Tower<br>    One Iake Plaza Building<br>    13th Floor Office 12A07 91307<br>    P.O. Box 336955<br>    Dubai, UAE,<br><br>and<br><br>Wagdi Mirghani Mahgoub, a Sudanese citizen,<br>    3 Zubair Pasha Street<br>    Khartoum, Sudan<br>    P.O. Box 54, | Civil Action No. 1:22-cv-01989<br><br>**JURY TRIAL DEMANDED** |

|  |  |
|---|---|
| Plaintiffs, | |
| v. | |
| THESENTRY.ORG, Inc., a New York corporation,<br>    1629 K Street, NW, Suite 300<br>    Washington, DC 20006, | |
| and | |
| Suliman Baldo,<br>    Address Unknown, | |
| Defendants. | |

## COMPLAINT FOR DAMAGES

Plaintiffs Intrade Co. (UK) Ltd., Mahgoub Sons Trading Co., Ltd., African Plantation (Sudan) Co., Ltd., Mahgoub Sons Ginning Co., Ltd., Almahgoub Pharmaceutical Co., Ltd., Intrade Commodities DMCC, and Wagdi Mirghani Mahgoub (collectively, "Plaintiffs") bring this complaint for damages against THESENTRY.ORG, Inc. and Suliman Baldo (collectively, "Defendants") allege:

### JURISDICTION AND VENUE

1. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332. It is a civil action between the citizen of one state and the citizens and/or subjects of foreign states and the amount in controversy, exclusive of costs and interest, exceeds seventy-five thousand dollars.

2. Venue is appropriate in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant THESENTRY.ORG's principal place of business is within this District and because a substantial part of the acts that give rise to Plaintiffs' claim occurred within this District.

3. This Court may exercise personal jurisdiction over Defendant THESENTRY.ORG because it is a citizen of the District of Columbia.

4. This Court may exercise personal jurisdiction over Defendant Suliman Baldo because he was an author of the article that is the subject of this lawsuit and he did so while he regularly served as a Senior Advisor to THESENTRY.ORG. As such, these claims arise out of his transaction of business in the District of Columbia. Further, they arise out of his contracting for services in the District of Columbia. Further, they arise out of his causing tortious injury in the District of Columbia because he provided the defamatory content for publication in the District of Columbia. Further, even if they arise out of acts or omissions outside of the District of Columbia, he caused injury in the District of Columbia and, by virtue of his position, he regularly does business, engages in a persistent course of conduct, and/or derives substantial revenue for services he renders in the District of Columbia.

## THE PARTIES

5. Plaintiff Intrade Co. (UK) Ltd. ("Intrade UK") is a limited company incorporated under the laws of England and Wales with its principal place of business in the United Kingdom.

6. Plaintiff Mahgoub Sons Trading Co., Ltd., ("MS Trading") is a Sudanese entity formed and registered in Sudan.

7. Plaintiff African Plantation (Sudan) Co., Ltd., ('African Plantation") is a Sudanese entity formed and registered in Sudan.

8. Plaintiff Mahgoub Sons Ginning Co., Ltd., ("MS Ginning") is a Sudanese entity formed and registered in Sudan.

9. Plaintiff Almahgoub Pharmaceutical Co., Ltd., ("MS Pharma") is a Sudanese entity formed and registered in Sudan.

10. Intrade Commodities DMCC, ("Intrade UAE") is a United Arab Emirates entity formed and registered in the UAE.

11. Plaintiff Wagdi Mirghani Mahgoub (individually, "Mahgoub") is an individual and a citizen of Sudan.

12. Defendant THESENTRY.ORG, Inc. does business as The Sentry and is a New York corporation. The Sentry's principal place of business is in Washington, D.C.

13. Defendant Suliman Baldo is an individual who, at the times relevant hereto, was a Senior Advisor to the Sentry and was an author of the article that is the subject of this lawsuit. For convenience, therefore, THESENTRY.ORG and Suliman Baldo are referred to herein collectively as, "the Sentry."

## INTRODUCTORY FACTS

14. Mahgoub Sons Group ("MSG") is an unincorporated association of businesses made up of:

    (a)    Plaintiff Mahgoub Sons Trading Co., Ltd.,

    (b)    Plaintiff African Plantation (Sudan) Co., Ltd.,

    (c)    Plaintiff Mahgoub Sons Ginning Co., Ltd.,

    (d)    Plaintiff Almahgoub Pharmaceutical Co., Ltd.,

    (e)    Plaintiff Intrade Co. (UK), Ltd.,

    (f)    Plaintiff Intrade Commodities DMCC,

    (g)    Mahgoub Sons Group Holding Co, Ltd.,

    (h)    El Nilein Engineering & Spare Parts Co., Ltd.,

    (i)    Mahgoub Sons Inputs and Services Co., Ltd.,

    (j)    Delta Processing & Packing Co., Ltd.,

    (k)    Sunan for Printing and Publishments Co., Ltd.,

    (l)    S24 Media Co., Ltd.,

    (m)    Commitrade Limited,

    (n)    Intrade Co. (UK) Ltd., Ethiopia Branch,

    (o)    MSG Egypt, and

    (p)    Blue Nile Company for Satellite and Digital Broadcasting.

15. Mahgoub is the chief executive officer of MSG and an owner of the plaintiff entities.

16. The members of MSG share common ownership and, collectively, all of the members of MSG do business as MSG. Indeed, throughout their respective industries, they are generally known as and referred to as MSG. For example, the group members have no individual websites. Instead, each is included as a division of MSG on MSG's website.

17. Business partners, lending institutions, and others, consider themselves doing business with MSG when dealing with members of MSG. Typically, the "official" names and status of member entities are not used except in formal business circumstances, such as when entering into legal agreements.

18. This is exemplified by the defamatory publication at issue in this lawsuit in which the Sentry refers to alleged acts of MSG member companies as if they were engaged in by MSG.

19. Thus, where, as here, someone publishes a sweeping defamatory attack on MSG, it is understood to pertain to all of the small number of entities operating as MSG. In fact, the evidence will show that those who do business with the entities operating as MSG understood the Sentry's defamatory attacks to refer to all of those entities.

20. The Sentry's false and defamatory article caused great harm to the reputations of all of MSG member entities. As is the nature of defamation, the reputational harm caused frequently is not overt, instead causing damage behind the scenes in ways that do not reveal themselves in directly traceable financial harm. Such is true for many of the MSG member entities. But, for the member entities that are plaintiffs in this case (the "MSG Plaintiff Members"), the financial harm was apparent, direct, and severe.

21. MSG's work is multifaceted. It is heavily involved in food security and agriculture. Roughly 45,000 individual employees and 40,000 beneficiary farmers have staked their livelihood and the ability to provide for their own families on MSG's successful mission to feed people in Sudan, the horn of Africa and the wider African region.

22. MSG has been operating for more than half a century. The business was created by Mahgoub's father in 1969, and continued to grow until the Sentry launched the defamatory

attack that is the subject of this lawsuit.  The business has been built upon values of honesty and respect, both for Sudan as a country and for its people.

23. During the time that MSG has been operating, Sudan has undergone unparalleled challenges, including five military coups, a regime of over three decades, unprecedented economic sanctions and a political revolution.  Despite the many challenges these circumstances create, MSG has run its business with resilience and integrity, in accordance with the law and with its country and its people at the forefront of its strategy.

24. Thanks to its reputable business practices, MSG operated for more than half a century without any criticism of its integrity in Sudan or elsewhere.

25. MSG's clients include the UN World Food Programme and other UN agencies.  MSG also works with other NGOs such as the Red Cross relief agencies and has done so since the 1990s for the provision of food and food produce.

26. One of MSG's important initiatives is its contract farming program, operated through African Plantation.  Farmers around Sudan are provided with assistance by African Plantation in the form of seeds, land preparation, fertilizers, machinery, and technical teams on the ground to grow certain crops.  The contracts provide that some of the output is then given to African Plantation in return for that assistance and some is sold to African Plantation at market price.  This critically important initiative helps some Sudanese people become more self-sufficient and less reliant on foreign aid, enhancing their sense of dignity, pride, and independence.

27. Intrade UK has been operating since 1990 and is incorporated as a limited company which is majority owned by Mr Mahgoub since 2009.  Intrade UK works in food supply and agri input supply.

28. Because of the Sentry's positioning as a pioneer of justice "reporting" on issues (and therefore verifying information), through its false accusations, it has successfully eroded reputations that have taken decades to build with one article full of false information in respect of one transaction.

29. When the Sentry falsely published that MSG, Mahgoub, and Intrade UK were involved in a grand scheme of corruption, the Sentry caused great harm to Plaintiffs' reputations and credibility in a way that had a tremendously harmful impact on countless individuals.

30. For example, when the Sentry's false accusations were repeated and republished in Sudan, many farmers concluded that the money in the contract farming program was stolen or was otherwise illicit. In turn, those farmers refused to return output and/or to sell it back to African Plantation.

31. In fact, African Plantation had its highest farmer default rate since the inception of the program. African Plantation had to downsize the program and pull out of areas to minimize its financial losses which amount to more than $5 million. MSG was not the only victim—so too were the participants in the program, the MSG individual employees, and the people who relied on the agricultural products every day. The farmers who previously relied on MSG's contract farming initiative are unable to receive that support through any other channel.

32. This is only one example of the serious harm that Plaintiffs have suffered as a result of the Sentry's false and defamatory attack.

33. As an otherwise well-respected organization whose own mission purports to be noble and altruistic, why would the Sentry act with such disregard for (and to the detriment of) so many people?

34. Plaintiffs do not know. But the Sentry's blistering false attack was no accident. Indeed, when Plaintiffs contacted the Sentry with the true facts—and evidence to support those facts—the Sentry was unfazed. Despite Plaintiffs' request that the Sentry merely correct its false and defamatory facts so that Plaintiffs could work to mitigate the harm the Sentry had caused, the Sentry steadfastly refused.

35. Plaintiffs have been left with no choice but to file this lawsuit in order to clear their names and try to repair the harm caused by the Sentry.

**ADDITIONAL FACTS**

36. In February 2020, the Sentry published an article entitled, Loan Wolves – Debt Scams Threaten Sudan's Democratic Transition and Fragile Economy (the "Article").

37. Along with the Article's title, the Sentry's 23 pages of content purports to report on a debt scam that the Sentry argues is one of many threatening Sudan's economy.

38. The Article names MSG, Mahgoub, and Intrade UK and it is clear from the content and context that the Sentry intended that readers would understand that it was accusing them of participating in the unlawful or otherwise illicit practices that are described in the Article. Many—if not all—readers understood the Article in just that way.

39. In order to convey the false and defamatory message that Plaintiffs' were involved in a corruption scheme, the Article includes a series of false statements of fact (some of which are independently defamatory).

40. Some of the allegations relate to a transaction that took place in 2012 in which Intrade UK supplied fertilizer to Badr Overseas (the "Transaction"). Badr Overseas was awarded the right to supply fertilizer to the Agricultural Bank of Sudan ("ABS"). This established a line of credit (in which none of the Plaintiffs were involved). Badr Overseas elected Intrade UK as its supplier for the fertilizer and, as such, ABS opened the letter of credit in favor of Intrade UK.

41. The timing of the Article is also significant. It was published almost eight years after the Transaction and five years after the Plaintiffs had any dealings with the Preferential Trade Area Bank ("PTA") in 2015. The Article was therefore written well after the Transaction in question. On the other hand, the Article coincided with the revolution in Sudan which overthrew the country's previous regime of 30 years and the transition into a new government for Sudan.

42. Contextually, the Article was an attempt to show the ways in which the ousted Sudanese government was corrupt and engaged in corrupt practices. This is clear from the recommendations for resolving such issues that were contained in the Article.

43. However, to conclude that the former government did not conduct its financial affairs cleanly and transparently is a far cry from having support for the contention that the transactions mentioned in the Article were improperly undertaken by either Intrade UK or the banks that were involved. It certainly does not follow that MSG and Mahgoub must have been involved in illegal or otherwise corrupt transactions and, indeed, they were not.

44. Simply, in context and based on the juxtaposition of the statements pertaining to Plaintiffs, the Sentry intended readers to conclude that MSG and Mahgoub participated in the corruption of the former Sudanese government.

**False Statements About Land Ownership**

45. In the Article the Sentry outlines a convoluted scenario regarding a loan, a plot of land that secured the loan, and allegations that Mahgoub was involved in a scheme relating to that loan.

46. By its words, the juxtaposition of those words, and otherwise, the Sentry intended to convey to readers that the transaction was corrupt or otherwise improper and that Mahgoub and MSG, themselves, were involved in a scheme to circumvent the law and to improperly collect on a bad debt. Many readers understood these false allegations just as the Sentry intended.

**False Implication of Secret or Nefarious Business Relationship**

47. In the Article, the Sentry also states: "In accounts reviewed by The Sentry and published in the local media, sources revealed that Mamoun and Mustafa partnered with Mahgoub, the CEO of MSG, to supply imports via Intrade Co.UK, an MSG subsidiary registered in the United Kingdom."

48. By using the word "reveal," the Sentry implies that Mamoun, Mustafa and Mahgoub's connection would otherwise have been a hidden or secret one and therefore there was something nefarious about it.

49. The parties openly did business in their corporate capacities, and not their personal ones, on transactions relating to the supply of agricultural goods to Badr Overseas.

50. MSG has been a supplier of agricultural goods for more than 40 years. Intrade UK has been operating since 1990 and incorporated as a limited company owned by Mahgoub since 2009. Both entities have existed and been in the supply chain of agricultural goods long before Badr Overseas became one of their clients.

51. There was nothing secret, untoward, suspicious, or unlawful in their transactions with Badr Overseas.

**False Implication of Secret or Nefarious Business Transaction**

52. In the Article, the Sentry further states: "In a letter dated July 17, 2012, three days after the PTA gave its final approval for the credit facility, Mamoun identified himself as general director of Badr Overseas for Integrated Solutions and informed GRC that his company had obtained a EUR 60 million ($78 million) line of credit to import agricultural products 'in coordination with the management of the ABS.' This letter instructed GRC to cancel a previous letter of credit in favor of the firm Commitrade BVI to supply the goods. Mamoun instructed GRC to request a new letter of credit from the ABS's main branch for the benefit of Intrade Co. UK."

53. Commitrade Limited ("Commitrade") and Intrade UK are members of MSG. Like Intrade UK, Commitrade existed long before Badr Overseas became a customer. It was incorporated in 2005 and Mahgoub is the sole shareholder.

54. Mamoun requested ABS to cancel the previous letter of credit in favor of one MSG affiliate and to issue a new one in favor of another. This is not evidence of corruption. Like many companies with multiple affiliates or subsidiaries, MSG often changed the affiliates and subsidiaries through which it undertook a transaction. This can be done for any number of legitimate reasons.

55. In this particular instance, Badr Overseas, following a public tender process, was awarded the right to supply fertilizers to ABS. ABS had opened the letter of credit to the supplier's bank, i.e. Commitrade's bank, Arab Banking Corporation ("ABC"), in favor of Commitrade. However, when ABC pulled out (which often occurred during transactions at the

time as Sudan was subject to economic sanctions), an alternative bank was found.  Commitrade was not a client of that bank and the bank was more comfortable transacting through Intrade UK.  Therefore the letter of credit was re-issued in favor of Intrade UK.

**False Statements Regarding Improper Transactions**

56. The Sentry also falsely reported: "The Sentry has reviewed documentation that reveals apparent over-invoicing in two separate fertilizer shipment transactions.  An €11.2 million Intrade Co. invoice dated November 3, 2012 lists a unit price of €512.98 per metric ton (MT) to deliver a shipment of 21,850 MT of imported urea fertilizer.  Another Intrade Co. invoice for €10 million dated November 24, 2012 covers the supply of 19,493 MT of urea from Qatar, at the same rate for delivery to Sudan.  Eastern and Southern African Trade and Development Bank is listed as the consignee for both shipments, with notification due to the Agricultural Bank of Sudan and the Green Revolution Company for Trade and Services Ltd.  However, the price of a metric ton of urea fertilizer in the international market was €291.90 in November 2012, according to the online data portal IndexMundi.  Intrade Co. UK's €512.98 charge to the ABS for these two shipments was thus 75.7% higher than the prevailing prices of urea fertilizer on the international market."

57. The Sentry knew these accusations were false when they were made.  The Sentry claimed to have carefully reviewed all of the documents in its possession and the falsity of the Sentry's statements is readily apparent from the face of those documents.

58. As an initial matter, the prices mentioned in this statement were not arbitrarily decided by Plaintiffs.  They are prices that Badr Overseas put forward in a public tender process that were subsequently awarded.  Plaintiffs merely acted as suppliers to Badr Overseas.

59. As the Sentry knew at the time of publication, the invoices refer to CFR, which stands for "cost and freight."  They also refer to "liner out" which means the cost of loading and cost of discharging at destination port is included in price.

60. Nevertheless, in the Article, the Sentry compares the invoice amounts to Index Mundi's rates.  These rates, as Index Mundi clearly states, are based on FOB prices in producing

countries. This means that Index Mundi's rates do not include any of the following, which were included in the invoice amount: (1) sea freight for vessel shipping to Port Sudan; (2) cost of finance for 360 days; (3) insurance; (4) packaging costs for 50kg bags; or (5) discharging costs at Port Sudan.

61. It was false to say that The Sentry reviewed invoices that show over-invoicing in two separate fertilizer shipment transactions when the invoices show no such thing. It was also false and misleading to compare the invoice amounts to Index Mundi's FOB rates when the actual invoices clearly show that the amounts are not FOB amounts.

62. This was not a mere oversight. The Sentry had all of this information and attempted to lend credibility to its false allegations by repeatedly telling readers that it "reviewed" the materials. What's more, the Sentry purports to be an "investigation and policy organization" that purports to base its work on "evidence." The Sentry trumpets its investigative expertise in alleged financial fraud and is served by a host of experts. At the time it published this false allegation, along with its misleading "evidence," the Sentry must have known—or purposefully avoided knowing—the truth.

63. As mentioned above, the invoices were based on a public tender process that took place in May 2012. Therefore, the costs were provided and agreed in May 2012 and the invoices were based on the amounts provided and agreed at that time. Index Mundi's May 2012 price was €401.02, significantly higher than the (incorrect) November 2012 reference of €291.90 used by the Sentry in the Article to enhance the false message that Plaintiffs had engaged in wrongful conduct with respect to the pricing.

64. Moreover, the Article included a diagram, which is entitled "Taking Credit: How Badr engineered a scam" and the diagram contains several false facts that lend to the overall defamatory message of the Article. Those include the false statement that Intrade UK "submitted inflated invoices," which is false for the reasons set out above.

**The Harm**

65. The Article is false and defamatory as to MSG, the MSG Plaintiff Members, Intrade UK, and as to Mahgoub, individually. The Sentry's false allegations are understood by readers to pertain to Mahgoub because the Sentry specifically singled him out as a partner of Mustafa in the real estate scheme described above and in respect of the transaction carried out through Intrade UK.

66. Taken together, the false statements convey the false and defamatory message that Plaintiffs engaged in an illegal and corrupt scheme to steal money or otherwise engage in financially illicit conduct.

67. These statements are defamatory, *per se* because they accuse Plaintiffs of engaging in illegal conduct and because they tend to do harm to Plaintiffs in their business and profession.

68. The Sentry's false allegations, following publication of the Article it was re-printed and referred to in several media publications in Sudan, which was foreseeable to (and likely intended by) the Sentry.

69. At least Mahgoub is entitled to an award of presumed damages.

70. The publication and republication of the Article has led business associates, banks, competitors, and the general public to call into question Plaintiffs' reputations for engaging in proper and legal business practices and for honesty and integrity.

71. By way of example only, Plaintiffs have been unable to proceed with business transactions both locally and internationally as a result of the Article. They have been told by several institutions that they cannot be onboarded as clients, cannot have business accounts and cannot receive funding as a result of the Article.

72. Moreover, as set forth above, numerous farmers defaulted on their obligations under the farm contract program, causing MSG substantial financial harm.

73. More specifically, as it relates to the farmers, as a direct and proximate result of the Sentry's defamatory attacks, farmers in the farm program defaulted on at least $5.5 million of

obligation to African Plantation. As a result of those loses, African Plantation substantially curtailed the program and has suffered (and will continue to suffer) additional lost profits in excess of $5 million.

74. Because of the false accusations in the Sentry Article, Intrade UK's London bank almost immediately closed its business accounts and cut off Intrade UK's access to its line of credit.

75. Intrade UK had relied on that line of credit in developing a particular business endeavor in Ethiopia.

76. As a direct and proximate result of the Sentry Article which, itself, led to the loss of Intrade UK's credit line, Intrade UK was not able to continue that business endeavor and has suffered (and will continue to suffer) lost profits in excess of $5 million.

77. At the time the Article was published, was involved in developing two Ethiopian projects in the textile and pharmaceutical industries. The company had already secured land and licenses in Ethiopia for these projects.

78. Mahgoub, as the chief executive of MSG had already begun the process of securing tens of millions of dollars of loans for these projects. In fact, Credit Suisse had already provided initial approval for substantial commitments.

79. Because the Article was understood by Credit Suisse to be about Mahgoub and MSG, and therefore, to pertain to Intrade UAE, and as a direct result of the defamatory content of the Article, Credit Suisse stopped their onboarding procedures and would no longer consider making the loans.

80. Without funding, the projects were immediately frozen, although substantial funds had already been expended on the projects. Intrade UAE has already expended and therefore suffered losses of more than $1.5 million in carrying costs and other expenses. Further, it has suffered lost profits by delay and/or cancellation of the projects in an amount in excess of $17 million.

81. African Plantation, MS Ginning, MS Trading, and MS Pharma were working on a similar project in Sudan to be supported by credit from African Development Bank.

82. As a direct and proximate result of the Article, that credit was not made available, the projects did not advance, and those companies lost (and continue to lose) profits in excess of $15 million.

83. As the chief executive of MSG and having been individually included in the false and defamatory Article, Mahgoub has suffered incredible harm to his reputation. In fact, as a direct result of the defamatory Article, Mahgoub has been denied the ability to participate in certain business opportunities that would have allowed him to participate in the St. Kitts "citizenship by investment" program which, in turn, would have allowed him to have a St. Kitts passport and to benefit from additional business opportunities and more accessible international travel.

84. The total financial harm suffered collectively by Plaintiffs is well in excess of $30 million.

**The Sentry's Negligence and Reckless Disregard for Truth**

85. Plaintiffs are not public figures. They do not have the household recognition, particularly where the Article was published, that is required to be deemed a public figure. Nor are Plaintiffs limited purpose public figures. They have not injected themselves into the midst of any public controversy for the purpose of influencing its outcome.

86. The Sentry clearly knew that its sources of information were not reliable. On information and belief, the Sentry relied on one Sudanese newspaper article, printed by Al Tayer, that it knew to be unreliable. That knowledge is evidenced by the fact that the Sentry did not disclose in the Article that it was relying on that unreliable source.

87. Further demonstrating that the Sentry had serious doubt (at least) about the truth of its allegations and the reliability of its sources, and apparently anticipating that it may be called to task for its false and defamatory Article, the Sentry tried to create the appearance of acting reasonably by purportedly sending an email with questions about these false allegations to

Mahgoub. However, the Sentry sent the email to a general email address for MSG that was not even the "contact us" email address that MSG listed on its website. The Sentry really did not care whether it received any response—or even whether its questions would ever be seen by Mahgoub or anyone at MSG. Although the Sentry could have easily could have ensured receipt of its questions by sending them by courier (such as FedEx or DHL) addressed to Mahgoub and delivered to the physical addresses for MSG and Intrade UK, it did not.

88. Further evidencing that the Sentry was only trying to create the impression of diligence and did not care to receive the truthful information in response to its serious allegations, when the Sentry did not get a response to the email it sent (because nobody saw it), the Sentry made no secondary effort to contact any of the Plaintiffs.

89. Further evidencing that the Sentry had no regard for the truth, although the events at issue had occurred roughly *seven years prior* and were not a matter of "hot news," the email, which the Sentry purportedly sent was dated December 26, 2019, and demanded a response by January 7, 2020. This artificial deadline, particularly over the New Year holiday, is indicative of the Sentry's blatant and reckless disregard for truth.

90. Simply, the Sentry did not act with reasonable care with respect to the false and defamatory Article, failing to take reasonable stops to verify information that false, defamatory, and obtained from unreliable sources. In fact, all of the Sentry's actions demonstrate that it either knew the allegations in the Article were false, or acted with reckless disregard for truth.

91. On information and belief, the Sentry knew its sources, and therefore the information it obtained from those sources, was unreliable. Indeed, documents in the Sentry's possession which it purported to review revealed that some of the information it had obtained from its sources was false. Nonetheless, with reckless disregard for truth, the Sentry published the false accusations anyway.

92. Moreover, the Sentry's feigned efforts to obtain truthful information from Plaintiffs demonstrates that the Sentry purposefully avoided the truth in further reckless disregard for truth.

## **FIRST CLAIM FOR RELIEF**

### (FOR LIBEL)

93. Plaintiffs hereby incorporate by reference each and every allegation set forth in Paragraphs 1 through 92.

94. The Article, taken in the context of all of the content, including the false statements set forth above, directly and by implication conveys the false message that Plaintiffs engaged in an illegal and corrupt scheme to steal money or otherwise engage in financially illicit conduct.

95. The Sentry intended readers to understand the false message, and many readers—if not all of them—understood the false message as the Sentry intended.

96. Additionally, the Sentry falsely stated that Mahgoub and MSG entered into a real estate transaction with Mustafa for the purpose of assisting in the collection of a bad debt.

97. The Sentry intended to covey the false message that they were involved in a scheme to circumvent the law and to improperly collect on a bad debt and many readers—if not all of them—understood the false message as the Sentry intended.

98. Additionally, the Sentry falsely reported about the fertilizer transaction.

99. Each of these acts of defamation are referred to collectively as the "Defamatory Statements."

100. The Defamatory Statements are libelous *per se*.

101. The Defamatory Statements are false.

102. At the time the Sentry made the Defamatory Statements, it knew the statements were false or acted with reckless disregard for truth.

103. The Sentry also failed to act with reasonable care in ascertaining the truth or falsity of the Defamatory Statements.

104. Plaintiffs have suffered loss of business and other special damages in an amount to be proven at trial.

105. Plaintiffs are also entitled to an award of presumed damages.

106. As a direct and proximate result of the Defamatory Statements, Plaintiffs have suffered injury to their reputations and Mahgoub has also suffered shame, mortification, and mental anguish, all to their general damage in an amount to be proven at trial.

107. The Sentry's conduct was willful, wanton, and malicious and was done with conscious disregard for Plaintiffs' rights. Accordingly, an award of punitive and exemplary damages against the Sentry is appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages in an amount to be proven at the time of trial, but not less than $30,000,000;

2. Punitive damages in an amount to be proven at trial;

3. Costs of suit incurred by Plaintiffs in this matter; and

4. Such further and other relief as the Court might deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims, as to all issues so triable.

Dated: July 8, 2022                        BROWNSTEIN HYATT FARBER SCHRECK, LLP

By: */s/ Julian R. Ellis, Jr.*
    Julian R. Ellis, Jr., Bar No. CO0109
    410 Seventeenth Street, Suite 2200
    Denver, CO 80202
    Phone: 303.223.1142
    Email: jellis@bhfs.com

    Mitchell J. Langberg (*application forthcoming*)
    100 North City Parkway, Suite 1600
    Las Vegas, NV 89106-4614
    Phone: 702.464.7098
    mlangberg@bhfs.com

*Attorneys for Plaintiffs*